**FILED**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JUL 1 4 2005

EUGENE R. WEDOFF
BANKRUPTCY JUDGE

|  |  |
|---|---|
| In re: | ) |
|  | ) |
| **LONGVIEW ALUMINUM, L.L.C.,** | ) Chapter 11 |
|  | ) |
| Debtor. | ) Case No. 03 B 12184 |

---

|  |  |
|---|---|
| **WILLIAM A. BRANDT, as Chapter 11** | ) |
| **Trustee of Longview Aluminum, L.L.C.,** | ) |
|  | ) |
| Plaintiff, | ) Adversary Proceeding Nos. |
| v. | ) |
|  | ) 04 A 00276 |
| **SAMUEL, SON & CO., LIMITED and** | ) 04 A 00279 |
| **SAMUEL, SON CHICAGO, LTD.,** | ) 04 A 01051 |
|  | ) |
| Defendants. | ) |

---

|  |  |
|---|---|
| **WILLIAM A. BRANDT, as Chapter 11** | ) |
| **Trustee of Longview Aluminum, L.L.C.,** | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| **DYNEGY GP, INC. and DMT HOLDINGS,** | ) |
| **INC. d/b/a Dynegy Marketing and Trade,** | ) |
|  | ) |
| Defendants. | ) |

---

|  |  |
|---|---|
| **WILLIAM A. BRANDT, as Chapter 11** | ) |
| **Trustee of Longview Aluminum, L.L.C.,** | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| **JENKENS & GILCHRIST, LLP,** | ) |
|  | ) |
| Defendant. | ) |



## MEMORANDUM OF DECISION

These three adversary proceedings, arising in the bankruptcy case of Longview Aluminum, L.L.C., are before the Court for judgment after a joint trial. The proceedings were brought by William A. Brandt, Longview's trustee, against (1) Samuel, Son & Co., Limited and Samuel, Son Chicago, Ltd. ("Samuel"); (2) Dynegy GP, Inc. and DMT Holdings, Inc. d/b/a Dynegy Marketing and Trade ("Dynegy"); (3) and Jenkens & Gilchrist, LLP ("Jenkens") (the "Defendants"). In these proceedings, the trustee alleges improper transfers of the debtor's property pursuant to §§ 544, 548 and 550 of the Bankruptcy Code (Title 11, U.S.C.) and §§ 5 and 6 of the Illinois Uniform Fraudulent Transfer Act (740 ILCS 160/1 *et seq*).

As discussed below, the trustee has failed to demonstrate that Longview Aluminum, L.L.C. was insolvent or was engaging in business with unreasonably small capital at the time of the challenged transfers. Accordingly, the Defendants are entitled to judgment on all counts in each of the three adversary proceedings.

### I. Jurisdiction

Under 28 U.S.C. § 1334(a), the district courts have exclusive jurisdiction over bankruptcy cases. Pursuant to 28 U.S.C. § 157(a) and its own Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has referred its bankruptcy cases to the bankruptcy court of this district. When presiding over a referred case, the bankruptcy court has jurisdiction under 28 U.S.C. § 157(b)(1) to enter appropriate orders and judgments in core proceedings within the case. The pending adversaries are core proceedings under 28 U.S.C. § 157(b)(2)(H) (proceedings to determine, avoid, or recover fraudulent conveyances). This court may therefore enter final judgments in these proceedings.

## II. Factual Background

### A. The business of Longview Aluminum, L.L.C.

The debtor in this chapter 11 case, Longview Aluminum, L.L.C. ("Longview LLC"), a Delaware limited liability company, was formed by Michigan Avenue Partners, LLC ("MAP") in November of 2000 to purchase an aluminum smelter in Longview, Washington from Reynolds Metals Company ("Reynolds"). (Jenkens Ex. 180 at 68-69, 90-92, 113; Trustee-Dynegy Ex. 11 at 7.)[1] MAP's principals owned and controlled Longview LLC and negotiated several agreements on behalf of both entities in connection with the acquisition of the smelter on February 26, 2001. (Kolleng Dep. at 70-75; Jenkens Ex. 180 at 68-69, 72-94; Trustee-Dynegy Ex. 11 at 7-16; Samuel Ex. 16.)

MAP negotiated an asset purchase agreement with Reynolds that provided Longview LLC with the operating rights and ownership of the smelter equipment, inventory, and raw materials, under a 99-year ground lease. (Trustee-Dynegy Ex. 11 at 9.) MAP caused Longview LLC to incur debts of $7.3 million on an unsecured promissory note to McCook Metals, L.L.C. (another MAP-controlled entity) for various acquisition costs and $167.1 million on a senior secured bridge note to the lender group that financed the purchase of the aluminum smelter. (Trustee-Dynegy Ex. 11 at 30-31.)

MAP also negotiated a number of agreements related to the Longview LLC's largest anticipated operating expenses—alumina, electric power, and the union workforce. (Trustee-Dynegy Ex. 11 at 16, 29-31.)

---

[1] The trial in this matter was conducted on two days, February 22-23, 2005. The trial transcript is in two volumes. Volume I contains the proceedings of February 22 and volume II, the proceedings of February 23. Other citations are to numbered exhibits filed by the trustee ("Trustee-Samuel Ex.," "Trustee-Dynegy Ex.," " Trustee-Jenkens Ex.") and by the Defendants ("Samuel Ex.," "Dynegy Ex.," "Jenkens Ex.") in each of the consolidated adversary proceedings; the Joint Pretrial Statements in each of the proceedings ("JPS-Samuel," "JPS-Dynegy," "JPS-Jenkens"); the Stipulation of Facts submitted by the Trustee and Jenkens & Gilchrist ("Stip."); and to the transcript of the deposition of John Kolleng, the vice chairman of Longview LLC, taken on February 7, 2005 ("Kolleng Dep.").

• MAP secured for Longview LLC a source of raw materials by executing an alumina supply agreement that provided for the company to purchase 120,000 metric tons of alumina from Reynolds by December 31, 2002. (*Id*. at 28.)

• Longview LLC assumed an electric power contract with the Bonneville Power Administration (BPA) that would expire on September 30, 2001 and executed a new five-year contract that ran from October 1, 2001 through September 30, 2006 (the "Block Power Sales Agreement"). (*Id*. at 7; Samuel Ex. 16.)[2]  In addition to these electric power supply contracts, MAP negotiated an agreement whereby BPA would pay Longview LLC $226 million to curtail its use of electric power at the Longview smelter between February 26, 2001 and June 30, 2002 ("Curtailment Agreement"). (Samuel Ex. 15.)[3]  In turn, Longview LLC was required to cease operations at the smelter throughout this period. As a result, Longview LLC furloughed all but a few of its 900 employees. (Tr. Vol. I at 145.)

• MAP agreed that Longview LLC would continue to pay normal wages and benefits to union employees and that operations would resume on April 1, 2002. (Dynegy Ex. 21 at MC 1602; Dynegy Ex. 23 at MC 1593.) In addition, MAP agreed with the unions that it would cause construction to begin on a new energy generation facility by no later than July 1, 2001, and that it would make an equity investment of up to $36 million if financing was otherwise unavailable. (Dynegy Ex. 23 at MC 1601.) In order to protect the unions against a permanent shutdown, Longview LLC promised to grant the unions a minimum $50 million security interest in the smelter by no later than September 20, 2001. (*Id*. at MC 1602.)

---

[2] BPA is a federal power-marketing agency with the power and transmission responsibilities to serve the electric power needs of its customers. *BPA Pacific Northwest Loads and Resources Study* (April 1, 2005), at <http://www.bpa.gov/power/pgp/whitebook/2000/2000 _WB_Part04_Sections1-5.pdf>. BPA acquires the power it sells to satisfy its contractual obligations from combined federal and non-federal resources. *Id*.

[3] The curtailment period ran through June 30, 2002, but Longview LLC was obligated to begin taking a reduced level of power from BPA on April 1, 2002. (Samuel Ex. 15.)

### B. MAP's strategy for competing effectively in the aluminum industry

MAP's acquisition of the Longview smelter was part of its plan to become a vertically
integrated competitor in the aluminum industry. (Jenkens Ex. 180 at 40-45.) MAP previously
acquired two aluminum-processing facilities in 1998 through other stand-alone entities—the
first, a plant in McCook, Illinois, from Reynolds through McCook Metals, L.L.C. (McCook)
and the second, a plant in Scottsboro, Alabama, from a Canadian company, through Scotts-
boro Aluminum, L.L.C. (Scottsboro). (*Id.* at 20-32.) When MAP acquired the McCook and
Scottsboro plants, it executed five-year supply agreements for Reynolds to deliver high-purity
aluminum, nearly all of which was produced at Reynolds' Longview aluminum smelter. (*Id.* at
37-38.) At the time, Reynolds controlled one of five primary alumina refineries, which sup-
plied the Longview smelter with the raw material, alumina. (*Id.* at 40-41.) Alcoa controlled
the remaining four primary alumina refineries. (*Id.*)

In 1999, Reynolds merged with Alcoa, Inc. (Trustee-Dynegy 11 at 7, Ex. C.) In con-
nection with Alcoa's acquisition of Reynolds and following antitrust complaints by Alcoa's
competitors, including MAP, the European Commission ordered Alcoa to divest at least 25%
of the Longview smelter and Reynolds' alumina refinery. (*Id.* at 7; Jenkens Ex. 180 at 51-62,
111-13.) In June of 2000, Alcoa hired Credit Suisse First Boston Corporation to prepare a
confidential offering memorandum and market the sale of the Longview smelter in compli-
ance with the European Commission's divestiture order. (Jenkens Ex. 180 at 64; Samuel Ex.
11.) MAP pursued negotiations with Alcoa during the fall of 2000 and ultimately agreed to
purchase 100% of the smelter assets through Longview LLC for a purchase price of $140 mil-
lion. (Jenkens Ex. 180 at 68-73.)

The Longview smelter produced several types of alloyed and unalloyed aluminum in-
got used in a variety of products ranging from aerospace parts to architectural components.
(Trustee-Dynegy Ex. 11 at Ex. C.) The smelter spanned 600 acres and consisted of six pro-

5

duction lines ("potlines") with an annual capacity of 204,000 metric tons of high-purity alumi-
num alloy ingot. (*Id.* at 7; Tr. Vol. 1 at 145.) An older portion of the smelter, the south plant,
was built in 1941 and included three potlines, a cast house, and ancillary facilities. (*Id.*) A
newer portion, the north plant, was constructed in 1966 and included three additional pot-
lines, a cast house, a carbon paste plant, a ship unloading dock, alumina storage silos, a pot dig-
ging and relining building, and a new maintenance facility. (*Id.*)

### C. Longview LLC's plan to resume operations at the smelter

Longview LLC "fully intended and expected to restart" operations at the smelter in
April 2002 at the end of the curtailment period. (Kolleng Dep. at 25-28, 128.) Louis Locke,
the plant manager, confirmed Longview LLC's plan to resume operations in the north plant.
(Tr. Vol. I at 147-48.) As part of that plan, Longview LLC dedicated approximately $200 mil-
lion of the $226 million received from BPA under the Curtailment Agreement to repayment of
debt on the senior secured bridge note and to compensation of the union employees during
curtailment. (Tr. Vol. I at 63-64; Kolleng Dep. at 175-78.) The remaining $26 million was
dedicated to funding various operating costs during curtailment and to maintaining the viabil-
ity of the smelter for reopening. (*Id.*) Additionally, with the hope that market conditions
would be favorable before the end of the curtailment period, Longview LLC executed an
agreement with Enron, whereby Enron agreed to provide electricity and alumina for produc-
tion of aluminum at the Longview smelter. (Kolleng Dep. at 82-83.) And, consistent with its
obligation to the union employees, MAP pursued negotiations with Enron to build a power
plant that would serve as an independent source of electricity for the Longview smelter. (*Id.*;
Jenkens Ex. 180 at 79-81.)

Longview LLC's plan to resume operations at the smelter did not come to fruition.
MAP's negotiations with Enron came to an abrupt halt in 2001. (Kolleng Dep. at 82-83.) By
April 2002, the aluminum industry in the Pacific Northwest was essentially non-operational

6

because the cost of electric power did not return to levels at which the aluminum smelters could operate profitably. (Trustee-Dynegy Ex. 11 at 11.) Moreover, the global price of aluminum remained low, providing an additional obstacle to profitable operations. (*Id.*) MAP's vertical integration strategy toppled when McCook and Scottsboro filed bankruptcy in August of 2001. (Tr. Vol. 1 at 133; JPS-Samuel at 2.) On March 4, 2003, Longview LLC itself filed a voluntary bankruptcy petition for relief under Chapter 11 of the Bankruptcy Code. (*See* Adv. Docket No. 1.) On August 5, 2003, the court entered an order approving the United States Trustee's appointment of William A. Brandt as trustee in this case. (Docket No. 347.)

### D. Transfers of Longview LLC's property during the curtailment period

During the curtailment period, MAP caused Longview LLC to make a number of payments to creditors of MAP, Longview LLC, and other MAP-controlled entities. Among these creditors were the defendants in the pending adversaries. Between June 2001 and March 2002, Longview LLC made sixteen payments to Samuel totaling $2,216,125 for repayment of a $2.5 million royalty advance extended by Samuel in connection with its purchase of a distribution business from Great Lakes Metals, L.L.C., an entity also controlled by MAP's principals. (JPS-Samuel at 2.) On July 26, 2001 Longview LLC made a single payment of $369,400 to Dynegy for natural gas delivered to McCook during May of 2001. (JPS-Dynegy at 2-3.) Between March 2001 and February 2002 Longview LLC made eight payments to Jenkens totaling $762,687.46 for legal services provided to MAP, McCook and Longview LLC. (Stip. at 2-12.)

### E. The issue of Longview LLC's solvency

The major factual dispute at trial was the question of solvency. The trustee relied on the expert opinion of Brooks D. Myhran. (Trustee-Dynegy Ex. 11.) Myhran opined that Longview LLC was insolvent at all relevant times because its liabilities exceeded the fair value of its assets under both a going concern and a liquidation analysis. (*Id.* at 5.) Myhran con-

cluded that Longview LLC was insolvent at the time of the challenged transfers because

(1) Longview LLC was insolvent at the time of the smelter acquisition on February 26, 2001;

(2) Longview LLC was insolvent at the conclusion of the curtailment period on April 1, 2002;

and (3) there were no material changes to Longview LLC's assets or liabilities during the cur-

tailment period when the challenged payments were made. (Trustee-Dynegy Ex. 11 at 5.)

The Defendants did not present an expert at trial but did challenge Myhran's opinion.

### III. Governing Legal Principles

The parties do not dispute the legal principles governing the resolution of this proceed-

ing. The trustee alleges constructively fraudulent transfers of the Longview LLC's property

pursuant to §§ 544, 548 and 550 of the Bankruptcy Code and §§ 5 and 6 of the Illinois Uni-

form Fraudulent Transfer Act ("UFTA").

For the non-bankruptcy law relevant to these claims, the parties have consistently ap-

plied Illinois law in their arguments, and accordingly Illinois law will be applied where appro-

priate in resolving these claims. *See In re Stoecker*, 5 F.3d 1022, 1029 (7th Cir. 1993) ("Where

. . . the parties do not make an issue of choice of law, [the court has] no obligation to make an

independent determination of what rule would apply if they had made an issue of the mat-

ter.").

Under § 548 of the Code, creditors may recover property that the debtor transferred

through "constructive fraud"—that is, without receiving fair value in exchange when the

debtor was in a condition of insolvency or when the debtor was inadequately capitalized. *See

In re McCook Metals, L.L.C.*, 319 B.R. 570, 586 (Bankr. N.D. Ill. 2005). As applicable to the

present case, the relevant language of § 548 provides:

> The trustee may avoid any transfer of an interest of the debtor in property . . .
> that was made . . . within one year before the date of the filing of the petition, if
> the debtor . . . (B) (i) received less than a reasonably equivalent value in ex-
> change for such transfer . . . and (ii) (I) was insolvent on the date that such
> transfer was made; (II) was engaged in a business transaction . . . for which any

8

property remaining with the debt was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a). Essentially similar provisions—but with a longer limitations period[4]—are contained in §§ 5 and 6 of the UFTA[5] and are properly asserted by the trustee under § 544 of the Code. *See In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir. 1998)("under the strong-arm provision of the Bankruptcy Code, 11 U.S.C. § 544(b), the trustee can avoid any transaction of the debtor that would be voidable by any actual unsecured creditor under state law").

The trustee has the burden of proof on all the elements of a fraudulent transfer and of the grounds for recovery. *See In re McCook Metals*, 319 B.R. at 587. Whether the trustee must prove constructive fraud by a clear and convincing standard or only by a preponderance of the evidence need not be decided here because the trustee's evidence fails to demonstrate insolvency or inadequate capitalization under even the lower preponderance standard.[6]

---

[4] Section 548 authorizes avoidance of transfers made within one year before the bankruptcy filing, while causes of action under the UFTA may be brought within 4 years after the transfer was made. *See* 740 ILCS 160/10(a).

[5] *See In re McCook Metals, L.L.C.*, 319 B.R. at 587; *Matthews v. Serafin*, 319 Ill. App.3d 72, 77 (Ill. App. Ct. 2001) (dealing with a claim under 740 ILCS 160/5(a)(2)).

[6] This court has recognized a dispute regarding the applicable standard of proof for actual fraud claims under § 548(a)(1) and, relying on the Supreme Court's decision in *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659 (1991), held that the preponderance standard should apply. *See In re McCook Metals, L.L.C.*, 319 B.R. at 587. As noted in the *McCook* decision, Illinois courts have not addressed the question under the UFTA. *Id; cf. Grochocinski v. Zeigler (In re Zeigler)*, 2005 WL 326891 at *4 (Bankr. N.D. Ill. Feb. 10, 2005) (applying the clear and convincing standard to an actual fraud claim under the UFTA). There also appear to be no reported Illinois decisions addressing the applicable standard of proof with regard to constructive fraud claims brought pursuant to the Illinois UFTA. Most decisions from other jurisdictions have applied the preponderance standard to state constructive fraud claims. *See In re Tri-Star Technologies Co.*, 260 B.R. 319, 324 (Bankr. D. Mass. 2001); *In re Lawler*, 141 B.R. 425, 428-29 (9th Cir. BAP 1992) (§ 544(b) claim governed by *Grogan* "preponderance of the evidence" standard).

### A. Insolvency

The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation ..." 11 U.S.C. § 101(32). The UFTA contains essentially the same definition of insolvency. *See* 740 ILCS 160/3 ("[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.") Generally, fair valuation reflects the price that a willing buyer would pay in an arm's length transaction. *See In re Ebbler Furniture and Appliances, Inc.*, 804 F.2d 87, 92 (7th Cir. 1986); *In re Coram Healthcare Corp.*, 315 B.R. 321, 340 (Bankr. D. Del. 2004); *In re Hoffinger Industries, Inc.*, 313 B.R. 812, 817 (Bankr. E.D. Ark. 2004) ("fair market value implies a willing seller and a willing buyer"); *In re WRT Energy Corp.*, 282 B.R. 343, 369 (Bankr. W.D. La. 2001) (same).

Courts have applied a "rule of retrojection" to determine a debtor's insolvency at a given point in time. The rule provides that if "a debtor was insolvent 'on the first known date and insolvent on the last relevant date,' and the trustee demonstrates 'the absence of any substantial or radical changes in the assets or liabilities of the bankruptcy between the retrojection dates,' the debtor is deemed to have been insolvent at all intermediate times." *See In re Toy King Distributors, Inc.*, 256 B.R. 1, 99 (Bankr. M.D. Fla. 2000) (citation omitted); *see also In re KZK Livestock, Inc.*, 290 B.R. 622 (Bankr. C.D. Ill. 2002).

It is generally accepted that whenever possible, a determination of insolvency should be based on seasonable appraisals or expert testimony. *Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 37 (2d. Cir. 1996). Additionally, unless a business is "on its deathbed", the proper valuation standard is a going concern basis. *In re Taxman Clothing Co.*, 905 F.2d 166, 169-70 (7th Cir. 1990) (finding that a business was not on its deathbed on the date at issue "because the assets that it could realize on in the ordinary course of its business exceeded the expenses of realizing on them, plus its (other) liabilities."). The *Taxman* court

10

noted, "caution should be taken not to consider property as 'dead' merely because hindsight teaches that the debtor was traveling on the road to financial ruin." *Id.* (*citing* 2 Collier on Bankruptcy, ¶ 101.31[5] at 101-94 (King 15th ed. 1989.)). The preferred method of valuing a business as a going concern is by performing a discounted cash flow analysis. *See In re 203 North LaSalle Street L.P.,* 190 B.R. 567, 574 (Bankr. N.D. Ill. 1995).

In addition, a valuation expert should account for contingent assets and liabilities. *See Covey v. Commercial Nat'l Bank of Peoria,* 960 F.2d 657 (7th Cir. 1992); *Matter of Xonics Photochemical, Inc.,* 841 F.2d 198, 200 (7th Cir. 1988) ("It makes no difference whether the firm has a contingent asset or a contingent liability; the asset or liability must be reduced to its present, or expected value before a determination can be made whether the firm's assets exceed its liabilities.").

### B. Inadequate capital

"Unreasonably small capital" is not defined in either § 548 or the UFTA. *See Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.),* 100 B.R. 127, 137 (Bankr. D. Mass. 1989). Unreasonably small capital "encompasses difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future." *In re Vadnais Lumber Supply, Inc.,* 100 B.R. at 137; *see also Moody v. Security Pacific Business Credit, Inc.,* 971 F.2d 1056, 1070 (3d Cir. 1992). "Viewed in this light, an 'unreasonably small capital' would refer to the inability to generate sufficient profits to sustain operations." *Moody,* 971 F.2d at 1070. The *Moody* court adopted a test based on reasonable foreseeability, which requires an objective assessment of the firm's financial projections. *Moody,* 971 F.2d at 1073 ("[t]he critical question is whether the parties' projections were reasonable.").

### IV. Failure to Establish Insolvency or Inadequate Capitalization

In accord with the legal principles outlined above, Myhran's solvency opinion compared the assets of Longview LLC to its liabilities at the time of the acquisition as a means of

establishing that Longview LLC was insolvent at the time of the challenged transfers. However, as to both assets and liabilities, Myhran's analysis is significantly flawed.

### A. The value of Longview LLC's assets

Myhran opined that the total value of Longview LLC's assets was $248.1 million on February 26, 2001. (Trustee-Dynegy Ex. 11 at 6.) Myhran's reconstructed balance sheet provides as follows:

| | |
|---|---|
| Current Assets (in millions) | |
| Cash | $3.2 |
| Curtailment contract/BPA | $226 |
| Intangible assets (closing costs) | $0 |
| Inventories | $4.9 |
| Negative goodwill | $0 |
| Total current assets | $234.1 |
| Long-term assets | $0 |
| Other assets | $7 |
| Seyfarth claim | $7 |
| Total Assets | $248.1 |

(*Id.*) Critically, this valuation recognizes no going concern value, based on Myhran's view (1) that Longview LLC could not expect to generate positive cash flows after the curtailment period and (2) that it would therefore be unable to secure adequate financing to reopen the smelter. (Trustee-Dynegy Ex. 11.)  Whether the smelter could be expected—as of February 26, 2001— to reopen and operate profitably after the curtailment period is thus a critical question for the solvency determination.

In making that determination, it is important to heed the Seventh Circuit's warning to avoid hindsight bias. As it actually happened, the smelter did not reopen— prices in the period after February 2001 for electricity and for processed aluminum apparently made the operation of any aluminum smelter in the Pacific Northwest unprofitable. (Trustee-Dynegy Ex. 11 at 11.)  However, this after-the-fact information does not necessarily reflect the knowledge available in February 2001.

A powerful indication of contemporary, informed opinion as to value comes from the principals of MAP who formed Longview LLC. With their finances and time at stake, and with access to substantial professional expertise, these individuals concluded at the time of the acquisition that the business was indeed one that could be profitably pursued. A January 2001 "Presentation to Financing Sources" reflects this conclusion. (Samuel Ex. 13 at MC 21332.). The company "fully intended and expected to restart" operations at the Longview smelter (Kolleng Dep. at 128), and it developed and implemented a comprehensive business plan to do so. (Tr. Vol. I. at 144-149; Tr. Vol. II at 116-17.)

In his opinion Myhran largely accepted the management projections of Longview LLC's operations; only with regard to future costs of electricity did he substantially disagree. (Trustee-Dynegy Ex. 11 at 15-17, Tab J.) Management's projections were that cost of electricity to Longview LLC would remain at $29.50/mwh through 2004. (Samuel Ex. 13 at MC21337.) Myhran, in contrast, concluded that in February 2001 there was a consensus that the market price of electric power would increase from $29.50/megawatt hour in 2001 to $45.00/megawatt hour in 2006. (Trustee-Dynegy 11 at 17, Ex. J.) Then, for the 2001-2005 period (the term of the Block Power Sales Agreement between Longview LLC and the BPA), Myhran applied a straight-line increase in Longview LLC's prospective electricity costs that tracked his projected market prices. (*Id.* at 18, Ex. J.) Myhran reasoned that, "assuming electric power prices in the financial projections for the years 2002-2005 that more closely approximate anticipated open-market prices is an appropriate analytic construct." (*Id.* at 18.)

As a method for establishing a reasonable projection of electricity costs to Longview LLC from the perspective of February 2001, this approach is doubly flawed. First, its assessment of the market prices anticipated in February 2001 has little evidentiary support. Myhran arrived at a $45.00/mwh projection for 2006 by averaging projections from financial reports released in September 2000, February 2001 and March 2001. (Trustee-Dynegy Ex. 11 at tab

13

F.) The report released in March 2001 contains largely irrelevant information about a proposed BPA contract rate rather than a projected market rate, and even this information that was not reasonably knowable as of February 2001. (*Id.*) The February 2001 report, which does contain timely information, provides no indication of expected market rates and refers only to a proposed BPA contract rate increase, which bears no direct correlation to market prices. (*Id.*) This leaves the September 2000 report, which consists of projections made by two financial consultants, who estimated that high prices would persist for several years and would ultimately stabilize in either a $35-40/megawatt hour or $40-50/megawatt hour range. (*Id.*)

The September 2000 report is not sufficiently comprehensive to capture, as Myhran's report suggests, "the late 2000/early 2001 perspective of industry observers and equity and aluminum analysts." (*Id.* at 18.) Furthermore, Myhran's assessment that these estimates are consistent with Longview LLC's projections is inaccurate. (Samuel Ex. 13.) In sum, Myhran's analysis of projected market rates is simply not supported by evidence sufficient to rebut the reasonableness of management's projections.

Second, and more importantly, unlike management's projections, Myhran's analytic construct fails to account for the effect that any change in market prices would have on the cost of electric power to Longview LLC under the Block Power Sales Agreement's "cost recovery adjustment clause" or "CRAC."[7]

Michael Lynch, the chairman of MAP and Longview LLC, recognized that during the summer of 2000, "there was some difficulty in the energy markets out there, not necessarily in the pricing ... but [in] the longevity of [the energy] contracts." (Jenkens Ex. 180 at 20.) To deal with this difficulty, MAP engaged Randy Hardy, the former executive director of BPA,

---

[7] The CRAC is a mechanism in the Block Power Sales Agreement designed to ensure that BPA would recover its cost of providing power. (Trustee-Dynegy Ex. 11 at 18.)

and Harvey Spiegel, the former general counsel to BPA, to advise MAP and Longview LLC on
energy negotiations with BPA. (*Id.*) These negotiations resulted in the execution of the Block
Power Sales Agreement, which guaranteed electrical power to Longview LLC at predeter-
mined prices, subject to the CRAC. (*Id.* at 21-22.)

Myhran disregarded the fundamental price-leveling benefit of the Block Power Sales
Agreement. (Jenkens Ex. 180 at 20.) Specifically, Myhran misconstrued the mechanics of the
CRAC by treating it as incorporating market prices directly. The contract rate of electricity
under the Block Power Sales Agreement with BPA is not directly correlated to market elec-
tricity prices because BPA is not, as Myhran posited, a market provider of electricity. (Tr. Vol.
II at 128.) BPA satisfies its contractual obligations from federal and non-federal resources.[8]
To meet its contractual obligations during an electricity shortage BPA might have to purchase
power on the open market. The CRAC compensates BPA for the cost of purchasing a portion
of its energy supply on the open market.[9] However, market rates of electricity would have no
direct impact on BPA's cost of electrical generation from its own power sources.

Myhran made no attempt to determine the probability of BPA implementing the
CRAC or the extent to which the CRAC would impact Longview LLC's cost of electricity.
(Tr. Vol. I at 98-99; Trustee-Dynegy Ex. 11 at 17-18.) Based on Myhran's analysis, it is simply
not possible to determine whether CRAC adjustments could have been expected in February
2001 to result in contract rates that tracked whatever market prices would then have been pro-

---

[8] The BPA describes itself on its website (available at <http:// www.bpa.gov>) as "a federal
agency . . . operating an extensive electricity transmission system and marketing wholesale
electrical power at cost from federal dams, one non-federal nuclear plant and other nonfederal
hydroelectric and wind energy generation facilities."

[9] *See* BPA's 2002 Supplemental Power Rate Proposal in June 2001 (April 1, 2005), at
<http://www.bpa.gov/Power/psp/rates/RateCase/sproposal/WP-02-FS-BPA-09.pdf.> at 1-2.
This information is consistent with the trustee's testimony that BPA could meet 62% of its
contractual supply obligations from its own sources during the relevant time period. (Tr. Vol.
II at 8-9.)

jected. In sum, Myhran's analytic construct is an unreliable method for projecting Longview
LLC's electricity costs.[10]

Without a firm basis to replace management's cost projections with Myhran's, it is not
possible to accept Myhran's opinion that the smelter could not be operated profitably and that
Longview LLC's assets had no value as a going concern on February 26, 2001. Thus, it is im-
possible to draw any conclusion about solvency on that date, and the retrojection theory of in-
solvency for the transfers in question must be rejected.

### B. The value of Longview LLC's liabilities

The weight of Myhran's opinion is further diminished by his valuation of Longview
LLC's liabilities. Myhran's reconstructed balance sheet indicates that Longview LLC's total
liabilities as of February 26, 2001 were $367.2 million:

| Current liabilities (in millions) | |
|---|---:|
| Accounts payable | $0 |
| Accrued expenses | $0 |
| Alumina supply agreement | $6.0 |
| Curtailment period union obligation | $33 |
| Senior secured bridge note | $167.1 |
| Total current liabilities | $206.1 |
| Long-term liabilities | |
| Due to affiliate | $7.3 |
| Pension liability | $42.7 |
| Post-retirement benefit obligations | $50.0 |
| Power generation facility | $36.0 |
| Severance payment | $4.5 |
| Take-or-pay contract/BPA | $20.6 |
| Total long-term liabilities | $161.1 |
| Total liabilities | $367.2 |

(Trustee-Dynegy Ex. 11 at 6.) However, nearly all of these entries are inappropriate, either
because they assume that the smelter would not restart or because they are debts of other
MAP-controlled entities rather than Longview LLC.[11]

---

[10] Myhran also failed to consider the possibility of an independent source of energy as a re-
sult of MAP's negotiations with Enron to build a power plant, which were ongoing at the time
of the acquisition. (Jenkens Ex. 180 at 21.)

### i.     $42.7 million controlled group liability

One of the largest liabilities that Myhran imputed to Longview LLC was a $42.7 mil-
lion obligation for the unfunded pension liability of McCook, a member of a group of busi-
nesses with common control and so mutually liable under ERISA.[12]  However, Myhran's opin-
ion fails to demonstrate that controlled group liability existed on February 26, 2001; how much
amount liability, if any, existed; or the extent to which other members of the controlled group
would satisfy the debt. (Trustee-Dynegy Ex. 11 at 30.)[13]

Myhran's report explains that the $42.7 million figure is derived from a memorandum
of the Pension Benefit Guarantee Corporation ("PBGC") and equals "the difference between
the present value of benefit liabilities for the [McCook pension plan] and total McCook pen-
sion plan assets." (Trustee-Dynegy Ex. 11 at 30.)[14]  Myhran could not verify when McCook
failed to make minimum funding payments or when the liens on Longview LLC's property
arose, and he admittedly adopted a retrospective approach by relying on the PBGC liens and

---

[11] The only listed liabilities immune from these criticisms are (1) the $33 million "curtail-
ment period union obligation"; (2) the $167.1 million "senior secured bridge note" obligation;
and (3) the $7.3 million "due to affiliate" obligation. (Trustee-Dynegy Ex. 11 at 6, 29-32.)
These items amount to $207.4 million of the $367.2 total debt computed by Myhran.

[12] Title IV imposes joint and several liability on a retirement plan's contributing sponsor and
each member of the sponsor's "controlled group." 29 U.S.C. § 1362(a); *Pension Ben. Guar.
Corp. v. Beverley*, 404 F.3d 243, 247 (4th Cir. 2005).

[13] A "controlled group" is a group of trades or businesses related by common ownership, de-
termined under regulations prescribed by the Secretary of Treasury. 29 U.S.C. §
1301(a)(14)(A) and (B).  PBGC's April 2002 memorandum indicates that the members of
McCook's controlled group are: Longview LLC, Scottsboro, First Avenue Development LLC,
Blue Star Funding LLC, Scottsboro Properties LLC, Great Lakes Metals LLC, and Great
Lakes Partners LLC (a subsidiary of which is Great Lakes Processing LLC). (Samuel Ex. 42.)
Section 1563 (title 26, U.S.C.) defines the "controlled group of corporations" as any group of
"parent-subsidiary controlled group"—that is, one or more chains of corporations connected
through stock ownership with a common parent—or "brother-sister controlled group"—that
is, corporations where five or fewer persons own majority shares of each corporation. (*Id.*)

[14] An April 2002 PBGC memorandum indicates that McCook's "unfunded benefit liabilities"
were $42,729,300 and its pension plan assets were approximately $3,846,300 million—a total
difference of $38,883,000—for which Myhran does not account. (Samuel Ex. 42.)

internal memoranda to attribute the entire pension obligation of McCook (and more) to Longview LLC. (Tr. Vol. 1 at 62-63; 101-102.)[15]

Myhran's retrospective approach does not reflect the information relevant to a solvency determination. McCook's (not to mention Longview LLC's) potential controlled group liability was contingent on events that were not reasonably knowable on February 26, 2001. As of February 26, 2001, McCook had not missed any minimum funding contributions. Controlled group liability arose subsequently when McCook failed to make minimum funding contributions in the fall of 2001 and when PBGC asserted liens against Longview LLC in 2002. Thus, for the purposes of a solvency analysis, McCook's pension obligation should not be recognized as a liability of Longview LLC.

Myhran relies on the expert opinion (and the court's findings) rendered in the McCook bankruptcy case, to the effect that McCook was insolvent as of December 31, 2000, as evidence that Longview LLC would indeed be liable for McCook's pension obligation, since McCook could not satisfy that obligation. (Trustee-Dynegy Ex. 11 at 30.) However, findings made in the McCook case are not binding on the Defendants in these proceedings. Furthermore, the fact that McCook may have been insolvent does not resolve the question of whether it could have satisfied at least some portion of its pension obligation on February 26, 2001. Even if it were reasonable for Myhran to attribute controlled group liability to Longview LLC, Myhran's analysis does not reasonably determine the amount of that liability as of February 26, 2001. In addition, Myhran made no independent determination regarding the ability of McCook or any other member of the controlled group to satisfy McCook's pension obligations.

---

[15] These liens and internal memoranda indicate that the liens against Longview LLC's property arose on January 15, 2002 based on the failure of McCook and Scottsboro to make minimum funding contributions in July and September of 2001. (Samuel Ex. 39, 40, 42.) PBGC's liens (for $1,327,207) were not filed against Longview LLC until March 14, 2002. (*Id.*)

Accordingly, Myhran's opinion does not prove that Longview LLC was obligated to pay a

$42.7 million controlled group liability as of February 26, 2001.

        ii.    *$36 million power generation facility*

Myhran improperly attributes the $36 million power generation facility obligation of

MAP to Longview LLC.  Paragraph 4 of the February 18, 2001 letter of understanding, enti-

tled "MAP Commitment to Build Power Generation Facility," provides in pertinent part:

> " ... recognizing the importance of continued access to low-cost power at
> Longview to the maintenance of jobs at Longview, *MAP* commits to the USWA
> that it will, by no later than July 1, 2001, cause fully-permitted construction to
> begin on one or more combined-cycle natural gas-fired generation facilities ...
> The parties recognize that *MAP* may raise financing for the Facility by various
> means and from various sources.  Without limiting the range of its possible al-
> ternatives, *MAP* agrees that, if it is necessary to complete the financing, *MAP*
> shall make an equity investment of up to $36 million from its own funds."

(Dynegy Ex. 23 at MC 01601)(emphasis added).

The obligation under the agreement, to finance the new power generation facilities "if

necessary," belonged to MAP, not Longview.  (Dynegy Ex. 23 at MC 1601.)

        iii.    *$20.6 million take-or-pay liability*

Myhran assumed that Longview LLC had no possibility of reopening at the end of the

curtailment period in order to conclude that Longview LLC would be liable to BPA for

$20.6 million under a "take-or-pay provision" in the Block Power Sales Agreement. (Trustee-

Dynegy Ex. 11 at 28.)[16]  Furthermore, Myhran's recognition of a $20.6 million take-or-pay li-

---

[16] The take-or-pay provision provides for damages in the event that Longview LLC does not
use the power as provided by the agreement:

> Longview shall pay BPA damages for any Purchase Deficiency
> equal to the amount by which the reasonable market value of
> such Purchase Deficiency is less than the price of the applicable
> IP-02 Rate.

(Samuel Ex. 16.) Purchase Deficiency is a term defined in the Block Power Sales Agreement
as "the amount of power to be curtailed." (Samuel Ex. 16.) The IP-02 Rate is the rate that
Longview LLC was to pay for electric power under the Block Power Sales Agreement. (Id.)
The IP-02 rate table is provided in Exhibit C to the agreement. (Id.)

ability figure is unreasonable because it involves no effort to determine the contract price of electricity to Longview LLC in relation to fluctuating market prices.

Myhran arrived at his $20.6 million figure by multiplying a 9% "damage factor" by the total payments due under the Block Power Sales Agreement. (Trustee-Dynegy Ex. 11 at 29.) The 9% damage factor is based on Myhran's determination that, over the term of the five-year electric power contract that expired in September of 2001, market prices had been, on average, lower than the applicable contract rate by approximately 9%. (*Id.* at 29, tab L.) Myhran's 9% damage factor is thus based on inapplicable historical data. (Tr. Vol. 90-91, 111-119.) It ignores significant differences between the historical electric power agreement expiring in 2001 and the new Block Power Sales Agreement—in particular, the impact of the CRAC— and it deals with a past period of energy pricing different from what was anticipated in February 2001 to occur in the period after that date.

    *iv.* *$50 million post-retirement benefit obligation; $6 million alumina supply agreement liability; $4.5 million severance payment obligation*

Myhran acknowledged that several liabilities on his reconstructed balance sheet were contingent on permanent shutdown and failed to account for any possibility that the smelter would reopen. (Trustee-Dynegy Ex. 11 at 12, 28-29.) It would have only been appropriate for Myhran to recognize these entire liabilities if the probability of a permanent shutdown were 100%, which is inconsistent with Myhran's own acknowledgement that Longview LLC had at least some prospect of operating as a going concern. (Id. at 12.) This criticism applies to the $50 million post-retirement benefit obligation to the unions for employment and retirement-related expenses, the $6 million liability related to the alumina supply agreement, and the $4.5 million severance payment to Longview LLC's salaried employees. (*Id.* at 28-32.)

In sum, Myhran's opinion substantially overestimates Longview LLC's liabilities as of February 2001. These flaws further undercut the reliability of his overall opinion and reflect

20

an additional failure on the part of the trustee to establish insolvency by a preponderance of
the evidence.

## C. Adequacy of Capitalization

In support of his theory that Longview LLC was inadequately capitalized, the trustee
relies on Myhran's opinion that, as of February 26, 2001, Longview LLC could not operate on
a going forward basis because it would not be able to secure adequate financing to reopen the
smelter. (Trustee-Dynegy Ex. 11 at 22.) Myhran opined that, "given the dire prospects for
the business as of the end of the curtailment period, Longview would not have been able to
develop a financial presentation that would have satisfied sources of credit or equity capital."
(*Id.*; Tr. Vol. I at 44.) Myhran reasoned that Longview LLC would have inadequate cash at
the end of curtailment, and without some type of financial partner, Longview LLC could not
afford to resume operations at the smelter. (Trustee-Dynegy Ex. 11 at 22.)

Myhran indicated that Longview LLC was initially capitalized with only $1,000 of in-
vested capital and could be expected to have $9.1 million in cash at the end of curtailment.
(*Id.* at 21, tab I; Tr. Vol. I at 43.) Myhran also projected that Longview LLC would have
$6.9 million in excess borrowing capacity at the end of curtailment. (Trustee-Dynegy Ex. 11 at
21, tab J.) In terms of costs, Myhran concurred with an April 2003 report prepared by Robin
G. Adams, which states that it could be expected to cost Longview LLC approximately $30
million to reopen the smelter. (Trustee-Dynegy Ex. 11 at 22, n. 40.)[17]

Myhran's opinion does not establish inadequate capitalization under the test formu-
lated in *Moody* because, as previously discussed, it fails to demonstrate that Longview LLC

---

[17] Consistent with the trustee's testimony, Adams estimated that operating the smelter dur-
ing curtailment would cost $500,000 per month. (Tr. Vol. I at 64, 154; Samuel Ex. 37 at 20.)
Adams also estimated a $10 million unrecoverable start up cost related to quasi-fixed produc-
tion costs that had to be spread over half the full production rate, $4.4 to $6.6 million in pot
relining costs and $8.3 million for a 30-day alumina supply, for a total of approximately $30
million. (*Id.*)

could not generate sufficient profits to sustain operations. Indeed, Myhran's opinion both underestimates Longview LLC's borrowing capacity and ignores reasonably anticipated sources of operating funds.

Although Myhran describes "excess borrowing capacity" as a percentage of accounts receivable and inventory, he calculates excess borrowing capacity as net of projected operating losses. (Trustee-Dynegy Ex. 11 at 21, tab J.) Assuming Longview LLC could expect to operate at least at break-even levels after the curtailment period (and Myhran's opinion fails to establish the contrary), Myhran's financial models would reflect "available borrowings" in the range of $12 to $33 million in 2002. (*Id.*) Given Longview LLC's reasonable prospect of generating positive cash flows as of February 26, 2001, its expected borrowing capacity would have been substantially higher. Furthermore, in concluding that Longview LLC would have no financial partners, Myhran ignored the fact that MAP agreed to make a $36 million equity investment in a new energy generation facility. (Dynegy Ex. 23 at MC 1601.)

Accordingly, Myhran's opinion that Longview LLC could not finance a reopening of the smelter anytime between February 26, 2001 and April 1, 2002, including the time of the challenged transfers, is unpersuasive. The trustee provided no additional evidence that Longview LLC was engaged in business with unreasonable small capital at the time of the challenged transfers and has thus again failed to satisfy its burden of proof.

## V. Conclusion

For the reasons set forth above, judgments will be entered, by separate order, in favor
of the Defendants on all counts in each of the adversary proceedings.


Dated: July 14, 2005

Eugene R. Wedoff
United States Bankruptcy Judge